## CHICAGO, R. I. & P. RY. CO. v. RISTY et al. (MINNEHAHA NAT. BANK OF SIOUX FALLS, S. D., e al., Interveners), and five other cases.

(District Court, D. South Dakota. February 17, 1922.)

Nos. 98–103.

1. **Constitutional law ⟷290(3)—Drains ⟷2(1)—Drainage statute, providing for general notice before establishment of drain and for hearing on question of benefits, held not unconstitutional as denying due process.**

The South Dakota drainage statute (Rev. Code S. D. 1919, § 8458 et seq.), which provides for general notice to all persons affected to show cause why proposed drainage district should not be established, and for notice and hearing on the question of benefits, at which any landowner may contest the amount of benefits or deny the existence of any benefits, does not violate Const. U. S. Amend. 14, as to due process.

2. **Courts ⟷282(3)—Suits attacking drainage assessment on constitutional grounds within the jurisdiction of the court.**

Suits attacking drainage ditch assessments as violative of the Constitution of the United States, and each involving an amount in excess of $3,000, exclusive of interest and costs, were within the jurisdiction of the federal District Court.

3. **Courts ⟷263—When real and substantial question under federal Constitution involved, court may decide all questions involved.**

Where bills involve a real and substantial question under the Constitution of the United States, the jurisdiction of a federal court extends to every question involved, whether of federal or state law.

4. **Courts ⟷262(2)—Remedy in federal court necessary to defeat suit in equity.**

Where diverse citizenship exists, the remedy at law which will prevent the bringing of a suit in a federal court of equity must be a remedy on the law side of the federal court, and not a remedy in the state courts.

5. **Drains ⟷71—County commissioners held without authority to take in new lands not benefited in assessing cost of repairs and maintenance.**

Where drainage ditches duly established under the South Dakota laws for the drainage of agricultural lands had become clogged in places and too narrow in others, and because of the inefficient manner of their construction a river into which they emptied was threatening to wash away large areas of land and change its course into a new channel, the duty of the county commissioners was to clean and maintain the ditches, under Rev. Code S. D. 1919, § 8470, and they had no power, by pretending to abandon the ditches and establish a new ditch on the same location, without in fact abandoning anything except the spillway, to assess a part of the costs of the maintenance and repairs on lands outside the original drainage districts and in no way benefited by the drainage thereby provided.

6. **Drains ⟷70—Statute held not to authorize abandonment of ditch for purpose of including additional territory in making assessment for repair and maintenance.**

Rev. Code S. D. 1919, § 8489, providing for the abandonment of a drainage ditch and the re-establishment of a ditch over the same territory,

---

⟷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

where proceedings to establish a ditch have been enjoined, vacated, or set aside, did not authorize county commissioners to abandon ditches constructed and in use, and to establish a new ditch on the same location for the purpose of including additional territory in assessing the costs of repairs and maintenance.

7. **Constitutional law** ⬅⬎233—Equal protection of the laws denied by making assessment on different basis than other property.

A city and railway and power companies, whose property was subjected to a drainage ditch assessment, were denied the equal protection of the laws, where their property was not assessed on the same basis as farm lands, and could not be assessed, on any reasonable basis, the amount which was assessed.

8 **Drains** ⬅⬎52—Duty to repair embraces duty to repair break in bank of river, etc., due to drainage ditches.

The duty to maintain drainage ditches under the South Dakota laws involves the duty to repair a break in the banks of a river, due to the inefficient manner in which the ditches were constructed, and to prevent water naturally flowing in the river from being taken therefrom.

9. **Constitutional law** ⬅⬎29—Provision for drainage districts for any public use held not self-executing.

The provision of Const. S. D. art. 21, § 6, that the Legislature may provide for the organization of drainage districts for the drainage of agricultural lands, and "for the drainage of lands for any public use," is not self-executing, in the absence of legislation providing for drainage, except drainage of agricultural lands.

In Equity. Six suits by the Chicago, Rock Island & Pacific Railway Company, by the Chicago, Milwaukee & St. Paul Railway Company, by the Chicago, St. Paul, Minneapolis & Omaha Railway Company, by the Northern States Power Company, by the City of Sioux Falls, and by the Great Northern Railway Company, respectively, against A. G. Risty and others, in which the Minnehaha National Bank of Sioux Falls, S. D., and others, intervened as defendants. Injunctions granted.

A. B. Fairbank, of Sioux Falls, S. D., for plaintiff Chicago, R. I. & P. Ry. Co.

C. O. Bailey, of Sioux Falls, S. D., and Ed. L. Grantham, of Aberdeen, S. D., for plaintiff Chicago, M. & St. P. Ry. Co.

C. O. Bailey, of Sioux Falls, S. D., for plaintiff Chicago, St. P., M. & O. Ry.

H. E. Judge, of Sioux Falls, S. D., for plaintiffs Northern States Power Co. and Great Northern Ry. Co.

R. W. Parliman, Sr., of Sioux Falls, S. D., for plaintiff city of Sioux Falls.

E. O. Jones, of Sioux Falls, S. D., for defendants.

N. B. Bartlett, of Sioux Falls, S. D., for intervening defendants.

ELLIOTT, District Judge. I have finally disposed of the questions presented in the various drainage ditch cases, consolidated for the purpose of trial, and which were tried and submitted upon single record.

[1] The question of the constitutionality of the South Dakota drainage statute (Rev. Code, S. D. 1919, § 8458 et seq.) is pleaded by each plaintiff, and upon this issue the interests of the plaintiffs in all

⬅⬎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

these suits are identical. It is urged by the plaintiffs in the various suits that the entire South Dakota drainage statute is unconstitutional, for the reason that it is in conflict with the Fourteenth Amendment of the Constitution of the United States. Plaintiffs call the court's attention to the provision of the Fourteenth Amendment that prevents the taking of property "without due process of law."

If the South Dakota statute does not give the person whose land is to be assessed for the drainage of agricultural lands his "day in court," then there is no "due process of law." I find, upon investigation of the various drainage ditch statutes, that almost universally the provision is made for the organization at the inception of the proceeding of a drainage district, with boundaries defined, organized after notice to all property owners within the district, and endowed by statute with certain powers consistent with the purpose for which the district is organized. I also note that ordinarily, where no provision is made for the formation of a drainage district, as is the case in this state, provisions are usually made for the notification of the property owners whose interests are supposed to be included in the drainage district, and for the giving to them of an opportunity to be heard in respect to the question of the practicability or feasibility of the drainage proposition, and whether or not the benefits will exceed the cost, and whether or not the particular lands of the owner shall be included within the drainage district and assessed its pro rata share of the benefits.

It is urged by the plaintiffs, and must be conceded, that in this regard the South Dakota statute differs from the drainage statutes of most other states. Section 8459, Revised Code of South Dakota, provides that a petition for proposed drainage may be filed with the board of county commissioners. This is the first step in the proceeding. This petition is only required to set forth the necessity for the drainage, a description of the route, its initial and terminal points, and its general course, or of its exact course in whole or in part, and a general statement of the territory likely to be affected thereby.

Under this statute petitioners are not required to describe the specific tracts of land to be included within the drainage area, or which will be affected thereby or assessed therefor. Neither is it necessary to give the names of the owners of the property. The statute requires only a "general statement" as to the extent of the territory affected.

Section 8461 of said Revised Code provides that the board shall fix a time and place for the hearing of the petition and shall give notice by publication at least once each week for two consecutive weeks in a newspaper in the county and by posting notices near the route of the proposed drainage. It also provides that such notice shall describe the route of the proposed drainage and the tract of country likely to be affected thereby, in general terms, the separate tracts of land through which the proposed drainage will pass, and give the names of the owners thereof as appears from the records in the office of the register of deeds on the date of the filing of the petition. It is further provided that such notice shall summon all persons af-

fected by the proposed drainage to appear at such hearing and show cause why the proposed drainage should not be established and constructed.

Plaintiffs note that this statute, except as to property owners through whose property the proposed drainage will pass, provides only this general notice, and especially complain that it gives no property owner any notice that his particular tract of land is included among the lands affected by the proposed drainage, and insist that the notice is broad enough to take in each and every tract of land included within the boundaries of the county in which the drainage project is situated. It is true that, other than this general notice, there is no notice whatever given to the property owner that his particular land is affected by the drainage proposition, or that he has any interest in it, or will be mulcted in assessment for benefits by reason thereof. He receives no summons or other notice, either by personal service or by mail. He has, however, the general notice given in the published summons by the commissioners to—

"all persons affected by the proposed drainage to appear at such hearing and show cause why the proposed drainage should not be established and constructed."

By section 8461 of the said Revised Code the county commissioners pass upon the petition at the time named in the summons and notice, and, if they find it feasible to establish the drainage, no provision is made for any other notice to any property owner, unless it should be found necessary to change the initial or terminal points, so that the drainage will pass through other lands than those described in the original notice, or to increase the width of the lands to be taken for the proposed drainage, in which case the board must give the owners of such lands notice. There is no provision, however, for any notice to any property owner after the drainage ditch is established. The board may then proceed without further notice to its construction. It may incur construction expense before taking any proceedings towards making an assessment for the payment of the costs, or it may, before doing the work, estimate the costs and make an apportionment of benefits, upon which the assessment may subsequently be spread by the county auditor.

Section 8463 of said Revised Code authorizes the said county commissioners, after establishing the drainage, to fix the proportion of benefits of the proposed drainage among the lands affected, and also appoint a time and place for equalizing the same. It is then provided that notice of such equalization of proportion of benefits shall be given by publication for two weeks. It is provided that this notice must give a description of each tract of land affected by the proposed drainage and the names of the owners as appears from the records of the office of the register of deeds. It is further provided that the lands to be charged with benefits include all pieces of property that, in the judgment of the board of county commissioners, are benefited by the drainage proposition. At this hearing the board fixes the proportion of benefits for each tract of land, taking any particular tract as a unit, and also fixes the benefit which any railroad company may

obtain for its property by such construction, and equalizes it together with the proportion of the benefits to tracts of land.

This statute seems to provide for this hearing for fixing the proportion of the benefits before the ditch is constructed and before it is known what will be the actual amount of money expended. This hearing may be delayed until after the ditch has been built. It also provides that in event there is further expense incurred, or if for any reason parties assessed do not pay the tax, a new proportion of benefits shall be fixed and new assessments made. At this hearing the owners of the lands alleged to be benefited have notice, have the right to appear and contest the amount of the benefits upon their lands, and may even urge that no benefits are derived. From this assessment there is a provision granting an appeal to the circuit court of the county in which the lands are situated, in which the proportional benefit may be an issue, and the owner of the land, upon such appeal, may contest the fact that there are any benefits to the land in question. The law further provides for an appeal from the determination of such issue in the circuit court to the Supreme Court of the state. After such proportional benefits are determined, the county auditor spreads the tax, and it then becomes a lien upon the property benefited.

This brief statement of the provisions of the statute, not at all complete, but in a general way, outlines the general powers of the board and the method of the establishment of the ditch and the various steps up to the spreading of the tax against the lands benefited. These proceedings are peculiarly limited to the drainage of agricultural lands, because the Constitution of the state of South Dakota (Const. art. 21, § 6) provides that:

"The drainage of agricultural lands is hereby declared to be a public purpose and the Legislature may provide therefor, and may provide for the organization of drainage districts for the drainage of lands for any public use, and may vest the corporate authorities thereof, and the corporate authorities of counties, townships and municipalities, with powers to constitute levees, drains and ditches, * * * by special assessments upon the property benefited thereby, according to the benefits received."

Pursuant to this provision of the Constitution, the Legislature of the state has provided for the drainage of agricultural lands; but nowhere is there any statutory enactment under which drainage districts may be formed for the drainage of lands "for any public use." Without repetition, and calling attention now to the reasons urged by the plaintiffs sustaining the unconstitutionality of this statute enacted for the purpose of draining agricultural lands, and considering the objections urged in various forms by the different plaintiffs, we find that all of the objections center about the criticism that no notice is provided the owners of lands affected by the drainage ditch, except the general notice, and in fact no personal notice until the date fixed by the board for the equalization or proportional assessments for the various tracts of land benefited by the drainage. It will be noted that the Legislature has provided that no tax can become effective, no assessment can be made, until the benefits have been ascertained and proportioned, and before this can be done a

definite day must be named by the board, and the various landowners are given notice.

The question resolves itself into one of whether or not this hearing after notice, with the right of appeal, constitutes "a day in court" to the various landowners. I have reviewed the authorities submitted by plaintiffs, and I am frank to confess that the statutes of this state do not provide for the description of the lands alleged to be benefited by the ditch, or the owners of the lands, or that notice shall be given to such owners, or that the owners shall appear and show cause, if any they have, why the ditch is not practicable or should not be established, or have the opportunity to show that the cost would be greater than the benefits, or would be confiscatory, and yet I am satisfied that the courts of the various states and the Supreme Court of the United States have recognized the power of the Legislature to provide the method of the levying of this tax against the lands benefited by a drainage ditch, and have held that a law that provides for notice and an appearance and the right to contest the amount of the tax, and to contest the right to tax at all, with the right of appeal therefrom, if given to the landowner prior to the time that a tax is levied and becomes effective, is "due process of law."

I was impressed upon the oral argument with counsel's reference to the decision in the North Dakota case, Soliah v. Heskin, 222 U. S. 522, 32 Sup. Ct. 103, 56 L. Ed. 294. Counsel urged that the law of North Dakota, very similar to ours, was sustained because it provided for a notice at the time of the establishment of the ditch. Reference to this opinion demonstrates that the court held as follows:

"Neither does that amendment invalidate an act authorizing an appointed board to determine whether a proposed drain will be a public benefit and create a drainage district consisting of land which it decides will be benefited by such drain, and to make special assessments accordingly, *if, as here, notice is given and an opportunity to be heard afforded the landowner before the assessment becomes a lien against his property.*" (Underscoring is mine.)

Under the South Dakota statute, applying this rule as announced in the North Dakota case, clearly, the notice is provided and an opportunity to be heard is afforded the landowner before the assessment becomes a lien upon his property, in the drainage of agricultural lands.

Louisiana has held that:

"Whenever by the laws of a state, or by state authority, a tax, assessment, servitude, or other burden is imposed upon property for the public use, * * * and those laws provide for a mode of confirming or contesting the charge thus imposed, in the ordinary courts of justice, with such notice to the person, or such proceeding in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings cannot be said to deprive the owner of his property without 'due process of law.'" Davidson v. New Orleans, 96 U. S. 97, 24 L. Ed. 616.

New York has held that:

"If the Legislature provides for notice to and hearing of each proprietor, at some stage of the proceedings, upon the question of what proportion of the tax shall be assessed upon his land, there is no taking of his property without due process of law." Spencer v. Merchant, 125 U. S. 355, 8 Sup. Ct. 926, 31 L. Ed. 763.

282 F.—24

Construing the statutes of the state of Missouri, it was held that it is granted "that the landowners are not afforded an opportunity to be heard in respect of the value of their lands. * * * While no hearing is given when the lands are appraised," a hearing "is given when the tax is sought to be enforced. The mode of enforcement is by a suit in a court of justice when * * * owners aggrieved by the valuation may have a full hearing upon that question. This is due process" of law. Embree v. K. C. & L. Road Dist., 240 U. S. 242, 36 Sup. Ct. 317, 60 L. Ed. 624.

The drainage statute of Michigan was considered in Roberts v. Smith, 115 Mich. 5, 72 N. W. 1091, and also in Gillett v. McLaughlin, 69 Mich. 547, 37 N. W. 551, and in Smith v. Carlow, 114 Mich. 67, 72 N. W. 22. In these cases the same objections were made to the constitutionality of the law that are urged by the plaintiffs here, and especially that the persons who did not own lands traversed by the drain, but who are within the assessment district, have no opportunity to be heard upon the necessity for laying the drain, and, further, that persons within the assessment district are entitled, under the Constitution, to a hearing upon the question of the public necessity for the drain. These contentions were denied in these cases, the law held constitutional, and a full discussion of the questions is to be found in these cases and the cases therein cited.

The Michigan statute is construed again in Voigt v. Detroit, 123 Mich. 547, 82 N. W. 253, and on appeal, 184 U. S. 115, 22 Sup. Ct. 337, 46 L. Ed. 459, in which it was urged that no provision is made for a notice to property owners of the time and place of hearing upon either the question of fixing the taxing district or the amount of the award to be spread thereon. This, it is claimed, leads to taking property without due process of law, and therefore the law is unconstitutional. It was claimed in this case, by counsel, that the complainant was entitled to notice of the hearing relating to the establishment of the assessment district, and of the amount of the total assessment, and because the statute did not provide for these notices it was unconstitutional. It was held in this case that this position could not be maintained.

"The provision of law by which, when the proceeding has reached the stage where it is proposed to levy the tax, a notice must be served on the property owner, was held sufficient to avoid the constitutional objection, notwithstanding no notice is required in respect to the creation of the district or the determination of the aggregate amount of the tax to be collected."

In Paulsen v. Portland, 149 U. S. 30, 13 Sup. Ct. 750, 37 L. Ed. 637, it is held:

"It is settled that, if provision is made 'for notice to and hearing of each proprietor, at some stage of the proceedings, upon the question of what proportion of tax shall be assessed upon his land, there is no taking of his property without due process of law.'"

I repeat that under the South Dakota statute there is ample provision for notice to every landowner, and an opportunity given to be present at the hearing, at which time and place he may assert all objections against the validity and justice of the proposed charge upon his property before the tax is levied, and carried by the county au-

ditor as such on the books of his office, and made a lien upon the property. It follows that, in my judgment, the South Dakota statute, enacted in the light of that provision of the Constitution of the state providing for the drainage of agricultural lands, is constitutional.

[2, 3] The case made by the bills filed by the plaintiffs in these various actions involve a real and substantial question under the Constitution of the United States. The amount involved in each case is greatly in excess of $3,000, exclusive of interest and costs. On the question of the jurisdiction of this court, I am of the opinion that each plaintiff states a case in his bill plainly cognizable in this court. All of the plaintiffs, except the city of Sioux Falls, allege diversity of citizenship, in addition to the constitutional question and the proper amount involved. I repeat that there can be no question as to the bills involving a real and substantial question under the Constitution of the United States, and in such a case the jurisdiction of this court extends to every question involved, whether of federal or state law, and enables the court to rest its judgment or decree on the decision of the questions as in its opinion effectually dispose of the cases. Davis et al. v. Wallace et al. (opinion Jan. 9, 1922) 257 U. S. 478, 42 Sup. Ct. 164, 66 L. Ed. ——, with cases there cited.

[4] It conclusively appears on the face of these pleadings that there is no speedy or adequate remedy at law. The remedy at law must be a remedy on the law side of the federal court, not a remedy in the state courts of South Dakota. In each of these cases, where there is a diversity of citizenship, this court of equity will not deny the plaintiff relief because there may be a remedy in the courts of the state, for the reason that the nonresident is not required to subject himself to jurisdiction of the courts of the state in order to obtain relief. U. S. Life Ins. Co. v. Cable, 98 Fed. 761, 39 C. C. A. 264. In neither of the cases at bar is there a remedy at law on the law side of the federal court. If plaintiffs, or either of them, are compelled to pay this tax, no action would lie on the law side of the court that would give them relief. No action on the law side of the court would protect them, or either of them, from future assessments and future responsibilities.

[5] There is the further issue presented on the face of the bills that for the reasons therein stated no drainage ditch No. 1 and 2, under which it is pretended this assessment is made, was ever established. That this is simply a pretense for the maintenance and repair of the ditches that had been theretofore established, and that the steps that have been taken by the county commissioners are without authority of law—in substance, that the board of county commissioners are trespassers, acting with no right or color of right; that in so far as there is an attempt to assess benefits to the property of the plaintiffs, or other property in the city of Sioux Falls, the proceedings are entirely void; that as to each of the plaintiffs the assessment of benefits made is arbitrary, unjust, illegal, and void. This is the basis of the claim that the assessment is such as to result in the property of the plaintiffs bearing more than its share of the burden of improvements, while such property is in no wise benefited thereby; that

the alleged benefits from this improvement have not been estimated upon these properties with the farm lands according to any standard which will produce approximately correct general results; that the taxes upon the plaintiff's property are upon some fanciful view of future benefits, while the farm property is assessed wholly according to its area and position; that the property of the respective plaintiffs is sought to be burdened for this improvement upon a basis so wholly different from that used for ascertaining the contribution demanded from individual owners of agricultural lands adjacent to the drain as necessarily to produce manifest inequality; that the plaintiffs are therefore deprived of the protection of the law which must be extended to all.

The determination of these various issues necessarily requires a consideration of the facts as they appear in the record. Fortunately there is practically no dispute as to the facts. The only dispute is as to the legal effect of the acts of the board of county commissioners.

What, then, was the situation at and prior to the time that the said board assumed authority to require the plaintiffs and others in the city of Sioux Falls to pay for the building of this new spillway, and the repair of the ditches hereinafter referred to? The Sioux river flows from the north, in a southerly direction, west of the city of Sioux Falls; then flows in an easterly direction, south of the main portion of the city; then flows north through the city of Sioux Falls, flowing a distance of some 10 miles from a point north of the city, where the drainage ditch hereinafter referred to leaves the river, to a point where the drainage ditch empties its waters into the river. The river thus describes a large horseshoe, the drainage ditch cutting across the open end, practically from the river on one side to the river on the other. Dell Rapids is situated in the Sioux Valley, more than 20 miles north of Sioux Falls.

At first there was established drainage ditch No. 1, and then drainage ditch No. 2. These two ditches extended from a point north of the city of Sioux Falls some distance to a point some 15 miles north of Sioux Falls, at which point drainage ditch No. 2 was intended to take the flood water from the Sioux river and conduct it down its length, into and through drainage ditch No. 1, to the river north of Sioux Falls, cutting through the hills adjacent to the river, and necessitating the conduct of the water down a fall of more than 100 feet into the river. Drainage ditch No. 1 and drainage ditch No. 2 were duly constructed under the provisions of the Constitution and laws of the state for the drainage of agricultural lands and were operated for the purpose for which they were constructed. The first petition for said drainage ditch No. 1 was filed in 1907, and the petition for drainage ditch No. 2 was filed in 1910. Such proceedings were had that these two ditches were constructed down the valley in a southerly direction, near the Sioux river until a point was reached north of the city of Sioux Falls, when the ditch was turned in an easterly direction across to the Sioux river at a point north and east of the city of Sioux Falls. Benefits were assessed and paid by the owners of adjacent lands under the provisions of the statutes of the state of South Dakota to which I have referred.

In 1915 the force of the waters conducted by these two drainage ditches was so great as to wash out what is called the spillway, through the bluff adjacent to the point where the waters from the ditches entered the river. The ditches in the meantime also became out of repair, and at one point several miles above the city, where the ditch approached the river, the water was cutting from the river into the ditch, threatening to turn the entire course of the Sioux river at this point into the ditch, and through the ditch back into the river, leaving the Sioux river from that point, and for about 12 miles around to where the ditch flowed into the river, without water. The spillway from the ditch through the bluff down into the river was so unskillfully, inefficiently, and unscientifically constructed that it would not stand the force of the water with a fall of 100 feet into the river. It was washed out, and the bluff, being of soil and sand, washed out to the entire depth of the river, and began washing back through the bluffs, threatening to cut clear back to a point where the water cut through from the river to the ditch, thus taking away from the city of Sioux Falls the benefits of the river, its sewer system, and the advantages of the stream, and take the water from the plaintiff the Northern States Power Company that naturally flowed down the river, except for interference by this drainage ditch, and in the cutting into this bluff also threatened to cut into the gravel bed in which the water supply of the city is located, a few miles west of it, and thus drain and destroy and take away from the city of Sioux Falls its water supply. This was the situation in 1916.

This situation presented no question of the drainage of agricultural lands. The people who had been responsible for the establishment of these two drainage ditches and the conduct of the water down through the hill to the river below, because of the inefficient manner in which the spillway had been constructed, had caused all of the trouble. The thing that confronted the board of county commissioners at that time, having charge of these two drainage districts, was the maintenance of the ditches and of the spillway, which was a part of the ditch that had already been constructed. In the construction of these ditches no suggestion had ever been made that the city of Sioux Falls, all lying entirely south of the districts drained, was in any manner interested in the drainage, or that there could be any benefits assessed to such city or any property owner thereof. The situation that confronted them was not drainage of agricultural lands; it was the maintenance of the ditches that had been established by them, and the prevention of the dangers threatened by the water that they were conducting down through these ditches, through this hill, into the river. They might have taken their chances upon the damages that their acts were responsible for, and let the river cut down through the ditch that they had constructed, and turned the course of the river there, and taken the water away from the city of Sioux Falls entirely, and exhausted and destroyed the city's water supply, and destroyed the power of the plaintiff the Northern States Power Company, by taking the water from the stream at the point where the power plant is located, without in any way endangering the agricultural lands along

this ditch, except so much of it as would be washed away in forming this new bed of the river.

I apprehend that we may reasonably find from the evidence here that such a cut-off in the river would be to the advantage of the landowners and prevent floods, so that it was not the drainage of the lands that was bothering the commissioners; it was not the purpose to drain agricultural lands that impelled the commissioners to act. The thing that impelled them to give this situation any consideration was the dangers that were threatened by reason of their having constructed these two ditches, and an effort to stop the ravages of the water they were conducting down there, by the construction of a substantial, adequate spillway. It was also necessary for them, in order to stop this threatened danger, to stop the ravages of the water at the point where it was cutting into their ditch. Certainly this condition never could have existed if they had never built the ditch. They were responsible for it, and it was their duty to maintain the ditch and to stop the ravages of the water cutting into it and through it.

This was one of the questions that they had before them, one of the problems that they had to solve, and they did proceed to construct this spillway in a substantial way, and to dike and with cement to hold the water in the stream at the place where it was cutting into the ditch. The statutes of the state of South Dakota specifically provide the duty and the method for the maintenance of these ditches. Section 8470 of the said Revised Code provides as follows:

"*Assessments for Maintenance.* For the cleaning and maintenance of any drainage ditch established under the provisions of this article, assessments may be made upon the landowners affected in the proportions determined for such drainage at any time upon the petition of any person setting forth the necessity thereof, and after due inspection by the board of county commissioners."

When this river cut through into the ditch, when the ditch became clogged in places and was not wide enough in others, when the spillway washed out by the force of the water they were conducting down the ditch, and the cutting of the bluff began and large areas of land were being washed away, and the other dangers were threatened, there was only one proposition presented to the commissioners, and that was one of maintenance—was one of taking care of the water that they were conducting down these two ditches, No. 1 and No. 2.

Instead of proceeding frankly to maintain the ditches they had established in the manner provided by statute; instead of carrying out the obligations they had assumed when they brought the water down there through these ditches, and attempted to deliver it through this bluff into the river; instead of proceeding regularly under this statute to do that which it was their duty to do; instead of performing the obligation that they had assumed when they established the ditches—that of maintaining them—they proceeded to act upon the assumption that, because they had conducted the water down into these ditches, and because of the inefficient manner in which they had constructed the ditches and built the spillway, and all of these dangers were threatened, therefore the plaintiffs, and others in Sioux Falls, were necessarily to be damaged; and, although a proper maintenance of these

two ditches, No. 1 and No. 2, would stop the damage, would prevent any danger, the commissioners evidently reasoned that, because the plaintiffs and others in Sioux Falls were in danger, they must pay for the repair of these ditches. That could not be done by simply saying the ditches shall be repaired, and the city of Sioux Falls, the plaintiffs, and others shall pay for it, or pay a part of it, and therefore they proceeded to do indirectly what it was conceded they could not do directly. In other words, they then began to look around and see what they could do in the way of taking care of the water and stopping these dangers.

At first it was proposed to change the spillway and conduct the water down in a southerly direction, through a slough or lake, into the river west of the city, and save the great fall that is involved at the point where the water enters the river from the spillway northeast of the city. This was abandoned, and they finally then pretended to act under a statute authorizing the abandonment of ditches. As a matter of fact there was no abandonment in good faith; no attempt to abandon the ditches. In fact, the reading of the resolution shows it was simply that they abandoned the spillway; that they filed a petition which was headed:

"To reconstruct and improve drainage ditches No. 1 and No. 2, Minnehaha county, South Dakota, and to construct a new spillway or outlet to said drainage ditches No. 1 and No. 2, and to pay therefor by assessment upon the property, persons, and corporations benefited thereby."

This petition was filed in July, 1916, with the board of county commissioners. There had never been an abandonment of ditch No. 1 and ditch No. 2. There had been a pretended abandonment of the spillway. But the commissioners proceeded then to construct a proper spillway on the identical location of the old one. In other words, no change whatever was made in the two ditches, No. 1 and No. 2, except to properly construct an efficient, adequate, substantial spillway, and prevent the river cutting from its bed into the ditch, cleaning out the ditch and repairing it, changing the gates at the head of the ditch, where the flood waters were taken from the river.

Upon this petition, for this purpose, the board of commissioners assumed authority and power to rechristen this ditch No. 1 and ditch No. 2, and call it ditch No. 1 and 2, and for the purpose of making these repairs and maintaining the old ditches under the new name, proceeded as if no ditch had been established, and as if ditches No. 1 and No. 2 were not in existence, and as if no obligation had been assumed by the drainage districts when they diverted the water down through the bluffs to the river, and proceeded to make the repairs and to reach out and say that the various plaintiffs were benefited. Instead of charging the repairs and maintenance of the ditches to those who were responsible for their construction under the provisions of the statutes above referred to, the commissioners proceeded to assume the right and authority to constitute a new drainage ditch, without any abandonment of the old ditches, and with no thought of using new or different drainage in any way, except to maintain them and to perfect that which had been inefficiently constructed, with no thought or

purpose except to repair the damage that had already been done and prevent future damage.

Under these circumstances, I am of the opinion that the commissioners were acting entirely without authority of law. There is no provision in the statutes of the state of South Dakota for the taking in of any other lands and assessing them, for the maintaining of a ditch after it has been constructed, and the benefits of its building have been assessed. I am of the opinion that the forming of this new ditch was simply a pretense, and that the plaintiff's pleading that it was a subterfuge is supported by the proof, resorted to for the sole purpose of attempting to burden the plaintiffs and others with the cost of the maintenance of the ditches theretofore constructed.

[6] I am of the opinion that section 8489 of said Revised Code, in regard to invalid and abandoned proceedings is not applicable to any situation such as existed here. That section has reference to the abandonment of a ditch that has been enjoined, vacated, set aside, or declared void, and specifically provides for the re-establishment of a ditch over the same territory, and that the new ditch shall assume the expenses paid on the old ditch, and give credit for any payment made upon the old ditch by people benefited. No such proceeding was attempted to be followed in this case. The proceedings establishing old ditches No. 1 and No. 2 have never been held void, never been set aside, never abandoned. They are in force to-day, and are responsible for the manner in which the ditches were constructed and for any damages that result from their negligence.

Under these circumstances the board of county commissioners had absolutely no authority, no right or color of right, were not acting under the provisions of any statute of the state, when they assumed the right to reach out and attempt to assess the benefits for the repair and maintenance of said ditches against the property of the various plaintiffs. They were mere trespassers, for the reason that no drainage ditch No. 1 and 2 was ever established and it has no existence. I am of the opinion that the proceedings of the board of commissioners in the repair and maintenance of these ditches, No. 1 and No. 2, by assuming the right to constitute a new drainage district, calling it district No. 1 and 2, and to assess benefits to the property of the plaintiffs, in so far as they are located in the city of Sioux Falls, are void. Entertaining this view, it follows that plaintiffs' prayer for an injunction should be granted.

[7] I may suggest in conclusion, however, that even if the court had found that drainage district No. 1 and 2, was legally constituted, and that the board of county commissioners had the right to extend the benefits to property within the city of Sioux Falls, the proofs overwhelmingly bring the plaintiffs within the rule recently expressed in Thomas et al. v. Kansas City Southern Railway Co. et al. (C. C. A.) 277 Fed. 708 (December term, A. D. 1921), in that the taxation that is imposed upon each of the plaintiffs is a much higher rate, and upon a different basis, than the tax upon land lying within the district. As a matter of fact, no direct benefits to the property of the railways within the city are shown. It is further shown that the benefits esti-

mated upon the plaintiffs' property were upon no standard that would probably produce results approximately the same as those upon the land in the drainage district. Taking, for instance, the tax upon one of the plaintiffs, the city of Sioux Falls, for its miles of streets in the city of Sioux Falls, with no pretense that there is any method of taxation, or measuring a benefit or a gain, that would produce even approximately correct general results, when considered with benefits to the lands in the district—simply a vague, indefinite generality, indulged in by the engineer and adopted by the board; benefits purely fanciful, with no substantial basis. Take the railroads, different plaintiffs, there is no pretense that the basis used had any relation to that used in fixing the value upon the lands in the district. It is admitted that the basis was wholly different from that used for ascertaining the contribution demanded of individual owners, and I find that such difference necessarily produces manifest inequality. There is an entire absence of the equal protection of the law that must be extended to all.

Referring to the testimony showing the manner of making assessments and the amount, in a general way, I think it fairly appears from the record in the case that the contention of the plaintiffs that the attempt to assess the property of these plaintiffs was an afterthought. It, in my judgment, is established that they could not be benefited, even admitting that this was a genuine drainage ditch for the purpose of draining agricultural lands; under the circumstances outlined in the evidence, there is no reasonable ground upon which the action of the board could be predicated. There is no pretense in this record that the railroad companies were treated like owners of agricultural lands. The discrimination is palpable, and the amount assessed simply an arbitrary assessment. These plaintiffs were not attempted to be assessed in any manner contemplated by the statute, for the payment of the costs of draining agricultural lands. The plaintiff Chicago, Rock Island & Pacific Railway Company is simply arbitrarily assessed $8,000, in raising a total of $300,000. The Northern States Power Company was assessed $50,000, one-fifth of the entire expense, although there is included in the pretended district agricultural lands something like 20 miles in length and several miles in width. The injustice of this is apparent, when it is noted that the record disclosed that it was located upon the rapids of the Sioux river, in the city of Sioux Falls; had been located there for many years. It was, therefore, entitled to the water that naturally flowed down the stream, to the end that it might secure power requisite for the conduct of its business.

[8] The injury that was to be remedied by this improvement was one that had been caused by drainage ditch No. 1 and drainage ditch No. 2, one that could not have existed, but for the establishment of these ditches. The duty to maintain these ditches involved the duty to repair the break from the banks of the river, and the duty to prevent the taking of the water from the river that would, or should, naturally flow therein to plaintiff's benefit.

Even if there had been a valid establishment of a drainage ditch at the time and place in controversy, and even if the board of county commissioners had jurisdiction, there was an entire failure to present

any evidence upon which any benefit could possibly be predicated against this plaintiff. The engineer who pretended to work out the hypothetical benefit admitted that he was not a hydroelectric engineer, and therefore not able to analyze and state the result of the different conditions of the water in the river. The suggestion applies with special force to the status of this plaintiff that the amount of benefits were fanciful, exorbitant, and arbitrary, with no possible appreciation in the value of its property as a result of this improvement, and it is self-evident that upon no basis that can be used and applied to all of the property tributary to this ditch could $30,000 be ascertained as the reasonable contribution to be demanded of this particular plaintiff.

These suggestions are applicable in a general way to the attempted assessment of the property of all of the plaintiffs, and I am of the opinion that the plaintiffs have all properly invoked the aid of this court from an arbitrary, unwarranted exercise of power by the board of county commissioners of Minnehaha county, who, without due process of law or compensation, threatened to deprive them, and each of them, of their property. What I have said, I think, should apply with equal force to all property in the city of Sioux Falls attempted to be assessed by the board of commissioners for the maintenance of this ditch under the name of a new ditch. The responsibility for the maintenance of this ditch, for the repair of the break from the river into the ditch, and the change of the headgates, and the cleaning out of the ditch, and the repair and reconstruction of the spillway, was and is upon the two drainage districts responsible for their construction and maintenance, and the amount expended, some $250,000, which, with interest, now amounts to $300,000 or more, is a charge upon those districts, to be assessed and made a lien upon the property within the districts, assessed in the proportion and collected in the manner provided by the Revised Code of the state of South Dakota for the maintenance of drainage ditches.

There is another and further suggestion: I am of the opinion that this reconstruction of the old spillway without change of location, the repair of the break from the river into the ditch, the cleaning of the ditch, the change of the headgates where the flood waters are taken from the river, everything that was done under this pretended establishment of a new ditch, could not be viewed in the same light or as serving the same purpose as the construction of the original ditches, because the thing that caused the board of commissioners to take any action with reference to the condition that then existed was the danger that existed because of the conduct of the water down through these two drainage ditches to and through this spillway. The danger that was threatened was not that the agricultural lands would not be drained, but that immense damage was threatened, that the course of the river was to be diverted to this cut-off, that great areas of land were threatened to be cut away by this river 100 feet deep, and that the water supply of the city was threatened to be taken away because of this drainage ditch and this imperfect spillway, because the water was to be taken from the river and all of the benefits of the river for several miles, through and around the city of Sioux Falls, would be de-

stroyed. The power of the Northern States Power Company would be destroyed, by taking the water from the river. If it had not been for those conditions, for these threatened dangers, no action would have been taken; the ditches would have continued to function as they had functioned before. If the spillway had been properly constructed originally, and if it had not proven inadequate, there would have been no cause for any action by the board in the year 1916. Every consideration that impelled action by the board was some phase of the threatened danger by reason of the inadequate and imperfect construction and maintenance of these two ditches. Neither of these considerations that influenced the action of the board had anything to do with draining agricultural lands.

[9] It may be said that to remedy these wrongs constituted a public use, as referred to in the Constitution of the state of South Dakota. Admitting that that is true, we are confronted with the proposition that there has been no legislation, conforming with the provisions of the Constitution, authorizing the Legislature to provide for the establishment of drainage ditch districts and the naming of officers with the powers therein referred to. If, therefore, any claim were made that the commissioners were acting under this authority, independent of the provision of law with reference to the drainage of agricultural lands, the answer is that the provision of the Constitution is not self-executing, and that no legislation has been provided carrying this provision of the Constitution into effect.

You may prepare proper orders in each case, granting plaintiff an injunction as to all property located in the city of Sioux Falls, and all property not within the old drainage district No. 1 and drainage district No. 2. Provide an exception in behalf of the plaintiffs to the order of the court denying the plea of the unconstitutionality of the drainage statute as applied to agricultural lands, and the defendants a general exception to each order.

⬡⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes